GATEWAY 2000, INC., Plaintiff,

v.

Tim R. KELLEY, Defendant.

No. CIV. A. 98–71746.

United States District Court,
E.D. Michigan,
Southern Division.

July 6, 1998.

Eugene Driker, Todd R. Mendel, Barris, Sott, Denn & Driker, Detroit, W. Terrence Kilroy, James C. Sullivan, Shughart, Thomson & Kilroy, Kansas City, MO, for Plaintiff.

Mark T. Boonstra, A. Michael Palizzi, Miller, Canfield, Paddock & Stone, Detroit, MI, for Defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

## I. Background

Plaintiff Gateway 2000, Inc. ("Gateway") sues its former employee Tim R. Kelley ("Kelley") to enforce the covenants of a non-compete agreement Kelley signed. Also implicated in the present action is Gateway's related suit to enforce a non-compete agreement against Jeffrey Livak ("Livak"), Kelley's direct supervisor for most of his tenure at Gateway. *Gateway 2000, Inc. v. Livak*, Case No. 98–72034 (E.D.Mich.). This matter comes before me on Gateway's motion for a preliminary injunction to enforce the non-compete agreement against Kelley.

Gateway had phenomenal success since its beginning in the mid–1980s. It began by selling computers out of the home of one of its co-founders and has progressed to the point where today it employs over 13,000 people on three continents. Gateway attributes this success to its dominance in the "made-to-order" niche of the computer sales business. "Made-to-order" means each individual customer specifies the internal capabilities of the computer he or she wants. Gateway then gathers pre-made components and assembles them into a computer that matches the customer's precise needs. Both businesses and individual consumers like the "made-to-order" system because it allows them to meet their needs without paying extra costs for unnecessary features. The majority of the approximately 12,000 computers Gateway sells per day are ordered through a toll-free 1–800 phone number. The remainder is solicited at Gateway's rela-

tively new chain of "country store" retail outlets.

Kelley began working for Gateway in the fall of 1989 at its headquarters in Iowa. He was the 62nd person Gateway hired and he signed a non-compete agreement at that time. By 1992, Kelley had advanced to the position of manufacturing engineer supervisor at Gateway's present headquarters in North Sioux City, South Dakota. Kelley only possesses an associate's degree in electrical engineering from Western Iowa Tech. and refers to himself as a "common sense" engineer.

When Gateway expanded its production capabilities in 1995, it sent a four-member team to oversee the creation of a new facility in Hampton, Virginia. Livak was the head of this team and was accompanied by Kelley, Kay Little, his Administrative Assistant, and Bill Shugrue, the Human Resources Manager. Kelley's responsibilities included overseeing the construction and expansion of the plant, preventive maintenance of its building, upkeep of the cafeteria, and oversight of the janitorial staff.

Initially, Kelley was very pleased with his transfer to Hampton because he felt he was an integral part of Gateway's expansion. His pleasure soon wore off as his tasks slowed down from the heady days of activity to the more mundane problems associated with the day-to-day maintenance of a manufacturing facility. He noticed that his authority shrank from being an important decision-making member on the transitional team to someone who merely carried out orders issued by his superiors in North Sioux City. Gateway's success had turned a small circle of insiders into multi-millionaires through the increase in value of their stock holdings. Despite being employee number 62, it became clear to Kelley that he was not part of this inner circle and had little chance of becoming wealthy while working for Gateway. These feelings of discontent crystallized when a promotion Kelley sought to an overseas position was instead given to a person whom Kelley had hired.

Sometime in late December 1997 or early January 1998, Livak mentioned to Kelley that he was interviewing with a small start-

up company called Inca Computers ("Inca"). A few weeks later, Livak announced that he was leaving Gateway and privately discussed with Kelley the benefits of working for this new company because of the potential to obtain stock. On February 10, Kelley tendered his resignation to Gateway and informed its management that he was leaving for a small start-up company. Kelley did not disclose that Inca was going to be his new employer. While preparing for Kelley's departure, Bill Shugrue, the human resources manager who opened the Hampton facility with Kelley, became aware of Kelley's intention to work for Inca. Shugrue informed Kelley that this could be a cause of problems with Kelley's non-compete agreement. Shugrue believed this discussion convinced Kelley to reconsider his decision to leave Gateway. Kelley apparently had a different view of Shugrue's persuasive abilities because he reaffirmed his intention to leave Gateway on February 19, and worked his last day on February 20, 1998.

Kelley then moved to Memphis, Tennessee, and began reporting to Livak as an employee of Inca. Kelley concedes that Inca is a direct competitor of Gateway and that it originally intended to assemble "made-to-order" computers in its Memphis plant. Gateway likewise acknowledges that Inca is its competitor. Six to eight weeks after Kelley started at Inca, a decision was made at Inca that it lacked the capabilities to assemble computers in a cost-efficient fashion. Inca then focussed on creating retail computer stores, mostly in Southeast Michigan. These stores would solicit customized orders from consumers and then contract with SCI Systems, Inc. ("SCI") to assemble the individualized computers in accordance with a customer's order. At Inca's request, Kelley transferred from Memphis to Michigan and assumed his present title of Property Manager. He is now responsible for managing layout changes within Inca's stores as well as overseeing the janitorial and waste management functions of these facilities.

## II. Confidential Information

During his nine-year stint with Gateway, Kelley acknowledges he had access to confi-

dential information. This information included knowledge of Gateway's assembly line, experimental ways to improve the line, budgetary information regarding Gateway's operations, projected sales volumes, and knowledge of the company's "road map" which specified when new products would be available to the consumer. Kelley asserts that he has never revealed this information to anyone outside of Gateway, and has been specifically instructed by Inca to keep this knowledge confidential.

### A. Non–Compete Agreements

Complicating Gateway's request for a preliminary injunction is the fact that it adopted at least six different types of non-compete agreements during the time Kelley was its employee. The non-compete provisions of all of these agreements restrict the employee from engaging in certain types of specified activities for a period of one year. The scope of the prohibited activity varies from agreement to agreement.

#### 1. Kelley/Livak Agreements

Section 1 of the non-compete agreement Kelley signed[1] (the "Kelley agreement") broadly prevents him from:

(i) carry[ing] on any business which is directly or indirectly competitive with the business of Employer in any state of the United States or any country in which Employer conducts or solicits or has conducted or solicited business prior to the Termination Date; (ii) in any other manner compet[ing] with Employer or its successors and assigns in such business (whether directly or indirectly) as an individual, partner, shareholder, director, officer, principal, agent, consultant, employee, or in any other relationship or capacity

for a period of one year. Section 2 of this agreement is a strong severability clause. It states that:

[t]o the extent the language of the covenants may restrict competition to a greater extent than that permitted by applicable law, that portion thereof shall be ineffec-

---

1. *See* Plaintiff's Exhibit 1.

tive, but the provisions of the covenants shall nevertheless remain effective with respect to such portions thereof as shall be permitted by applicable law.

Section 3 is the confidentiality provision. This clause prevents Kelley from revealing "information of a confidential nature," and describes certain types of protected confidential information. The last "miscellaneous" section of the agreement designates Iowa law as governing its enforcement.

The form Kelley signed appears to have been Gateway's first foray into the world of non-compete arrangements. It was used prior to Kelley's employment in 1989 and was discontinued at some point in 1991. Its successor[2] contains all of the above-quoted language and is similar to the Kelley agreement. The main difference between the Kelley agreement and its successor is that the second agreement designates South Dakota law as controlling of its terms. Presumably, this change was made to reflect Gateway's move of its headquarters across the Iowa border into North Sioux City, South Dakota. This second successor agreement was used from 1991 until 1996 and is the form which Livak signed.[3] Of the 90 employees at the director level and higher, 51 signed a Kelley-style agreement.

### 2. "List" Agreements

I refer to the next two agreements as "list" agreements because they make specific reference to a list of competitors. These agreements bar an employee from working for the companies listed in the agreement during a twelve-month period following termination.

The first "list" agreement[4] was used by the company in mid–1996, and was the only agreement ever used at the Hampton facility. Testimony indicates that Kelley and Livak were in all likelihood the only two fulltime employees at Hampton who signed Kelley-style agreements. This new non-compete agreement prevents an employee from working as:

an employee, director, officer, principal agent or consultant with any of ten specified leading competitors of Gateway at the time Employee terminates his or her employment with Gateway. The list of such leading competitors shall be available from Gateway's Corporate Human Resources Office in North Sioux City, South Dakota, and will be updated periodically.

The agreement states that the non-compete provision is unenforceable in the event Gateway provides a written exception to it or if the employee is terminated as part of a reduction in Gateway's overall workforce.

The second list agreement[5] came into existence in July of 1996 and continued to be used until recently. This agreement prohibits the employee from working

as a director, officer, principal agent or consultant with any competitors of Gateway specified at the time Employee terminates employment with Gateway. The list of such competitors shall be available from the Company's Corporate Human Resources Office in North Sioux City, South Dakota, and will be updated periodically.

This language is notably different from prior versions because it omits the word "employee" from those positions in which the signor is prohibited from working upon leaving Gateway.

Gateway created the "list of competitors" no later than the fall of 1996. The list was updated at least six times. See Defendant's Exhibit 2, Plaintiff's Exhibit 7. The fifth revision, dated May 14, 1998, and all prior versions, do not name Inca as a competitor. Only the sixth revision, which was authored while the preliminary injunction hearing was in progress, mentions Inca and SCI. Thirty-one of Gateway's ninety employees at the director level and higher are presently bound by a "list" agreement. The person Gateway hired to replace Kelley, Terry Bjorklund, and Kelley's boss after Livak's departure, George Thompson, are both bound by "list" agree-

2.  See Plaintiff's Exhibit 2.

3.  Because of the similarity between the agreements which Kelley and Livak signed, I refer to them generically as the "Kelley agreement."

4.  See Plaintiff's Exhibit 4.

5.  See Plaintiff's Exhibit 5.

ments.[6] Thompson is presently the head of manufacturing at the Hampton facility.

### 3. Other Agreements

Gateway's last type of a non-compete agreement [7] was created in May of 1997. This agreement prohibits the employee from working "in any capacity, with any competitor of Gateway known by Gateway at the Termination Date." Employees in the "country store" division signed this agreement, but it is not clear when and to what extent individuals outside of that division were given this agreement to sign.

Also presented into evidence was the non-compete agreement of Aleysa Terry–Caray.[8] Ms. Terry–Caray signed her agreement in February of 1993, and managed to negotiate with Gateway so that she was only prohibited from working for seven specifically identified competitors.[9] The rest of her agreement is essentially identical to the Kelley agreement. Ms. Terry–Caray is alleged to be the only employee who entered into this type of an arrangement.

### III. Litigation Events

Following Kelley's resignation in February of 1998, Gateway took two months to bring the present suit. On April 28, Gateway filed its complaint and immediately sought a temporary restraining order ("TRO"). Because local counsel had a conflict of interest problem, Gateway withdrew its motion for a TRO. New counsel obtained an expedited discovery schedule and presented two days of hearings in support of its motion for a preliminary injunction. The hearing was adjourned until June 24, so that a witness could be produced who would address the unresolved issue as to what caused Gateway to shift from the Kelley-style agreements to the "list" agreements. During this one-week delay, Gateway apparently reviewed its non-compete policies and changed its conduct in two ways. The first change was to switch the type of

agreements which new employees at the Hampton facility were given to sign from the "list" agreement to the agreements which prohibit an employee from working for any competitor "known" to Gateway. The second change involved adding Inca and SCI to the list of competitors as part of the sixth revision of that document. Because these two eleventh-hour changes can only be described as conduct taken in anticipation of litigation, I accord them little weight.

### IV. Jurisdiction and Choice of Law

Jurisdiction based on 28 U.S.C. § 1332 is not contested and I find that the statutory requirements have been satisfied.

▮▮▮ The non-compete agreement Kelley signed has a choice-of-law provision which designates Iowa law as controlling. Michigan courts honor contractually stipulated choice-of-law provisions so long as there is a "substantial relationship" between the parties or the transaction to the state whose law is chosen. *Chrysler Corp. v. Skyline Ind. Services, Inc.*, 448 Mich. 113, 528 N.W.2d 698, 703–704 (Mich.1995). Iowa bears a substantial relation to the transaction because Gateway was headquartered in Iowa when Kelley signed the agreement, Kelly was hired in Iowa, and worked there until the company headquarters moved.

Kelley's objection to applying Iowa law is his allegation that he signed a second non-compete agreement identifying South Dakota's law as governing. This contention is one of Kelley's defenses to the claim that he breached his non-compete agreement, so I address it now. Kelley alleges that the second non-compete agreement he signed was of the "list" variety and superseded the first "Kelley style" agreement. If true, Gateway would have no cause of action because Inca was not on the list of competitors at the time Kelley left its employment. The only evidence supporting Kelley's contention that he

---

6. *See* Defendant's Exhibits 1 and 9.

7. *See* Plaintiff's Exhibit 6.

8. Actually, the handwriting on Plaintiff's Exhibit 3 is so indecipherable, that I cannot be certain I am spelling the employee's name correctly. For

purposes of this opinion, the person named on Plaintiff's Exhibit 3 will be called Aleysa Terry–Caray.

9. These competitors were IBM, Compaq, Dell, AST, Compuadd, Apple, and Zeos.

signed a superseding "list" agreement is his own self-serving testimony and the affidavit of another former Gateway employee who claims to remember seeing Kelley sign a "list" agreement. Kelley is unable to produce a copy of that document, and Gateway avers that no such document exists. The only non-compete agreement bearing Kelley's signature is the one he signed in 1989, and Gateway's general policy is to only require an employee to sign a non-compete agreement at the time he is hired. Accordingly, I find that the non-compete agreement governing the present dispute is the Kelley-style agreement signed by him in 1989. This agreement designates Iowa law as the governing statutory scheme, and for the reasons previously explained I hold that Iowa has sufficient contact to the present dispute to justify applying its law.[10]

## V. Preliminary Injunction

In deciding whether to issue a preliminary injunction, I must address the four factors: "(1) likelihood of success on the merits; (2) the irreparable harm that could result if the injunction is not issued; (3) the impact on the public interest; and (4) the possibility of substantial harm to others." *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992). I now apply this test to determine whether to grant Gateway's motion.

### A. Likelihood of Success on the Merits

■ To show a likelihood of success on the merits, Gateway must demonstrate not only that Kelley breached his agreement, but that the agreement is enforceable. Iowa law requires a court to balance three factors in determining whether a non-compete agreement is enforceable. These factors, stated in question form, are: "1) is the restriction reasonably necessary for the protection of the employer's business; 2) is it unreasonably restrictive of the employee's rights; and 3) is it prejudicial to the public interest." *Phone Connection, Inc. v. Harbst,* 494 N.W.2d 445, 448 (Iowa Ct.App.1992); *Uncle*

*B's Bakery, Inc., v. O'Rourke,* 920 F.Supp. 1405, 1431 (N.D.Iowa 1996).

1. Is the restriction reasonably necessary for the protection of Gateway's business?

Gateway "bears the initial burden on the first prong of this test of showing that enforcement of the covenant is reasonably necessary to protect its business." *Curtis 1000 v. Youngblade,* 878 F.Supp. 1224, 1263 (N.D.Iowa 1995). While Kelley admitted to having confidential information on a variety of issues such as pricing and sales volume, Gateway focusses its arguments on his familiarity with the assembly line and the "product road map." Gateway asserts that knowledge of its production line would make it easier for a competitor to enter the "made-to-order" business, and that knowledge of the "product road map" could enable a competitor to time its release of new products in such a way as to damage Gateway. It may be that a competitor would have an easier time creating a "made-to-order" production line if it possessed inside knowledge of Gateway's process, but this point was never made clear. Gateway does not explain or identify the secret parts of its assembly line that a competitor would have difficulty deriving on its own. Similarly, the "product road map" was never presented to me with an accompanying explanation as to how a competitor's awareness of it would lead to predatory tactics by that company.

a. Other employees' agreements indicate that Kelley's agreement was overbroad.

Much of the hearing centered on a different method of analyzing the reasonableness of the restriction. Kelley notes that the person who took his job, his boss, and all of the other employees at Hampton signed a "list" type agreement. All these people were free to leave Gateway to go work for Inca if they chose to do so. Kelley's duties involved construction and building maintenance. His boss and a number of other Hampton em-

---

**10.** The parties did not debate the choice-of-law issue because Iowa law is similar in this area to other relevant jurisdictions so that the final outcome of the case is unaffected by my choice-of-law decision.

ployees had equal or greater knowledge of the assembly line and the product road map than Kelley because they worked directly in these areas. By choosing only to bind these employees with a "list" agreement, Gateway's conduct indicates that it only needs protection against employees who leave for certain identified competitors. Any attempt to restrict Kelley from working for a company not on the competitors' list, when compared to more recent non-compete agreements, is unreasonable.

Since Gateway never explained why it changed its non-compete agreement, I must draw inferences from surrounding facts. The obvious inference which explains why Gateway made the conscious decision to shift from the Kelley-style agreements to the "list" agreements is that the company concluded the "list" agreement provided Gateway with all the protection it needs. In order to be certain that I had all of the relevant information on this point, I suspended the preliminary injunction hearing for nearly a week to allow Gateway the opportunity to explain its reasons for making this switch. Despite presenting a member of its General Counsel's office and one of its co-founders, Gateway was unable to locate a single present or former employee who could shed any light on this topic.

Instead of direct evidence, Gateway tries to rebut the negative implications of this policy shift through legal argument. Its first theory is that it is improper for me to even consider the agreements which other employees signed. It argues that "in examining the reasonableness of the [non-compete] covenant, the court should consider several factors, including (a) reasonable time and area restrictions, (b) the employee's gain of special training or peculiar knowledge and customer contact through employment with the party seeking to enforce the covenant, (c) the nature of the business itself, accessibility to information peculiar to the employer's business, and the nature of the occupation which is restrained." *Curtis 1000*, 878 F.Supp. at 1263. Gateway believes this language prohibits me from considering the "list" agreements because it does not specifically enumerate the relevance of non-compete clauses

which other employees signed. This argument misses the mark for the simple reason that nothing in the above-quoted paragraph suggests a court can only look at the enumerated factors. *Curtis 1000* instructs a court to look at "several factors, including" the listed ones. The opinion does not say or even imply that these are the only factors which bear on an agreement's reasonableness. Instead, I must look to all "facts and circumstances that shed light on the reasonableness of the restraint as applied to the individual interests of both parties." *Id.* at 1260 (citing *Iowa Glass Depot Inc. v. Jindrich*, 338 N.W.2d 376, 383 (Iowa 1983)). Gateway's attempt to argue that *Curtis 1000* restricts the factors I can consider is simply misplaced.

Gateway also argues that the "list" agreements should not be considered because they are parole evidence to the agreement Kelley signed. Gateway contends that deals other employees struck should be irrelevant to a determination of the enforceability of Kelley's agreement. As support, Gateway cites a West Virginia decision stating that "agreements not to compete entered into by [the employee] are 'reasonable by their terms and provisions' even if other employees negotiate better deals." Whether other employees do or do not have to execute such agreements is of no consequence to this case as this aspect "rises and falls with each individual case." *Cutright v. Metropolitan Life Insurance Co.*, 201 W.Va. 50, 491 S.E.2d 308, 314 (1997).

*Cutright* is obviously not controlling because it is a West Virginia case interpreting West Virginia law, while I must apply Iowa law. Even as persuasive authority, *Cutright* is of limited value. The court in *Cutright* issued a nine-page opinion in which the bulk of its analysis is devoted to a determination that the Supremacy Clause of the U.S. Constitution pre-empts certain provisions of West Virginia's insurance code. That issue is clearly not in question in the present case. The two sentences Gateway cites are the only comments relating to the non-compete issue and that is not enough explanation for me to determine if *Cutright* involves the

same type of shift in corporate policy that is at issue in the present case.

*Cutright* may be correct in stating that a co-worker's agreement is irrelevant when one employee's duties are so diverse from his peers that he cannot be said to be similarly situated. When one employee has access to uniquely damaging information, or receives highly specialized training, the employer may have a legitimate need to bind that employee in a more restrictive manner than his co-workers. There has been no showing that the present case is such a situation. Kelley's duties primarily involved overseeing the construction and day-to-day maintenance of the physical plant at Hampton. Kelley had no more than a working knowledge of either the assembly line or the product road map. Kelley was not so actively engaged in either of these areas that Gateway needs to restrict him more severely than every other employee at Hampton.

### b. Analysis

■ Returning to the question regarding whether Gateway reasonably needs the protection it now seeks, I look at the *Curtis 1000* factors of a) reasonable time and area restrictions; b) employee's special knowledge; and c) the nature of the business. *Curtis 1000*, 878 F.Supp. at 1263. I find that a) the restriction is limited in time frame to one year but extremely broad in scope because it prohibits Kelley from working in any capacity for any computer company anywhere in the world; b) Kelley had access to some confidential information, but none of it was peculiarly specialized or sensitive; and c) that there is nothing in the nature of Gateway's business which is more secretive than any other competitive enterprise. These factors do not by themselves give a clear indication whether Kelley's agreement is reasonable, so I look at all of the facts as a whole. I find the dispositive feature of the present case to be that Gateway's decision to switch from the Kelley-style agreements to "list" agreements shows an acknowledgment that it only requires the protection of the "list" agreement. Gateway now seeks protection beyond what the "list" agreement would provide. I hold it fails to meet its burden of showing that it reasonably needs this additional protection.

### 2. Is the agreement unreasonably restrictive of Kelley's rights?

■ The second factor to examine in determining if an agreement is enforceable under Iowa law is whether it is unreasonably restrictive of the employee's rights. There is little doubt that the duration of the agreement, one year, is reasonable. By contrast, the scope of the agreement is extremely broad. Kelley is limited from working as "an individual, partner, shareholder, director, officer, principal, agent, consultant, [or] employee" for any company directly or indirectly competitive with Gateway in any state or country where Gateway sells its product. This has the practical effect of preventing Kelley from working in any capacity for any computer-related company anywhere in the world. A scope this broad is troubling because it leaves Gateway free to terminate Kelley's employment contract at a moment's notice and with no strings attached. By contrast, Kelley is tied to Gateway for one year following the end of his employment because there is nowhere in the world he can relocate to. I find that the non-compete agreement is unreasonably restrictive of Kelley's rights.

### 3. Prejudice to the Public Interest

Non-compete agreements always involve "two conflicting policies, freedom to contract and the doctrine against contractual restraints of trade." *Curtis 1000*, 878 F.Supp. at 1257. It is easy for a court to say that public policy favors the end result it reaches by simply citing whichever policy supports its conclusion. I resist this temptation and instead look for prejudice to the public interest as to what practical effect my decision to enforce or not to enforce the agreement will have on the public. Neither party presents any evidence suggesting the public's ability to purchase a computer will be influenced in the least by the outcome of this case. I conclude the public interest is unaffected by these proceedings.

### 4. Summary of Iowa's Enforceability Test

I find that the non-compete agreement provides Gateway with more protection than it needs, acts as an unreasonable restraint on Kelley's employability, and does not affect the public interest. Gateway therefore has a low likelihood of success on the merits because the most probable outcome at trial is a judicial determination that Kelley's non-compete agreement is unenforceable.

### B. Irreparable Harm

The analysis of whether Gateway suffers irreparable harm mirrors my discussion regarding whether Gateway reasonably needs the protection of the Kelley agreement. Courts often find irreparable harm in non-compete cases because of the difficulty in calculating the damages a former employee will cause. In order for me to reach a similar conclusion, Gateway must first show how Kelley's employment with Inca will damage it.

As I have previously explained, Gateway fails to make this showing because it only offers the blanket assertions that it will be harmed. Gateway claims Inca will be able to compete against it more effectively if that competitor has Kelley's knowledge of its assembly line and product road map. What is lacking is any detail regarding the secrets of the assembly line or how Inca could time the release of a new product in a damaging way. Gateway's decision to switch to a form agreement that only prohibits employees from working for certain specified competitors is strong evidence that someone with Kelley's level of knowledge cannot cause irreparable harm by working for Inca. Gateway's failure to make a satisfactory showing on the irreparable harm factor opposes my entering an injunction.

### C. Balancing the Factors

In order to issue a preliminary injunction, I must balance the four *Basicomputer* factors. Gateway has been unable to make a satisfactory showing on either the likelihood of success or irreparable harm factors. The other two factors, public interest and harm to others, did not receive much attention from the parties. Since not even a single factor supports enjoining Kelley, I deny Gateway's motion for a preliminary injunction.

## VI. Section 3—Confidentiality Issues

At oral argument, Gateway asserted it was seeking an injunction to enforce the section 3 "confidentiality" provisions of the non-compete agreement. While certain of Gateway's pleading mentions section 3, this was the first time Gateway made clear to me that it wanted enforcement of more than the section 1 non-compete covenant. An injunction enforcing section 3 would require Kelley to keep secret all "information of a confidential nature" that he learned during his time at Gateway. Kelley admits that he is bound by section 3 and asserts that he has never released any confidential information. The argument and evidence presented at the hearing dealt exclusively with the section 1 issue, so I agree with Kelley when he states that no evidence suggests he has ever released any confidential information. Without any evidence or argument supporting its request for a section 3 injunction, I find Gateway fails to meet its burden as to all four of the factors necessary to grant a preliminary injunction. Thus, I deny the request for a preliminary injunction enjoining Kelley from violating section 3 of his non-compete agreement.

## VII. Conclusion

Gateway 2000's request for a preliminary injunction is DENIED.

IT IS SO ORDERED.