**GATEWAY 2000, INC., Plaintiff,**

v.

**Jeffrey LIVAK, Defendants.**

**No. Civ.A. 98–72034.**

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 28, 1998.

Eugene Driker, Todd R. Mendel, Barris, Sott, Denn & Driker, Detroit, MI, W. Terrence Kilroy, James C. Sullivan, Shugart, Thomson & Kilroy, Kansas City, MO, David G. Hetzel, Ronald W. Zdrojeski, LeBoeuf, Lamb, Greene & MacRae, Hartford, CT, Thomas M. Woods, Mt. Clemens, MI, James D. Adducci, Marshall L. Blankenship, Adducci, Dorf, Lehner, Mitchell and Blankenship, Chicago, IL, for Plaintiff.

Mark T. Boonstra, A. Michael Palizzi, Miller, Canfield, Paddock & Stone, Detroit, MI, for Defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

### I. Background

In this suit, Gateway 2000, Inc. ("Gateway") seeks to enjoin its former employee Jeffrey Livak ("Livak") from violating the terms of a non-compete agreement. For a related discussion, see my decision in *Gateway 2000, Inc. v. Kelley*, 9 F.Supp.2d 790 (E.D.Mich.1998) (Feikens, J.) denying Gateway's motion for a preliminary injunction which would have prevented former employee Tim Kelley ("Kelley") from working for Inca Computers ("Inca").

#### A. Parties

Gateway has experienced phenomenal success in the business of assembling and selling computers. It began operating out of the home of its founder in the 1980's, and has grown to the point where it today employs over 13,000 people on three continents. Gateway's success arises out of its dominance in the "made-to-order" niche of the computer market. "Made-to-order" means Gateway solicits and assembles orders from customers that are specifically tailored to their precise computer needs.

In the *Kelley* suit, Gateway acknowledged that Inca was a competitor. While Inca originally intended to engage in the assembly of "made-to-order" computers, it soon discovered it was unable to do this work in a cost-efficient fashion. Thus, it recently closed its plant in Memphis, Tennessee, and contracted with SCI Systems ("SCI") to assemble the computers it needs.

SCI was established in the early 1960's and presently employs 28,000 people at 32

factories throughout the world. It provides design, manufacturing, assembly, and distribution services in the computer, computer peripheral, telecommunications, medical, industrial, consumer, and military markets. Among its many varied lines of business, SCI engages in the manufacture of "motherboards."[1] Gateway purchases substantial quantities of motherboards from SCI annually, subject to an agreement that the details of these purchases are kept confidential. A separate profitable business SCI engages in is the assembly of "made-to-order" computers. Companies like Inca, Hewlett–Packard, Apple Computers, and others, contract with SCI to assemble some or all of the computers that their customers order. In practical effect, computers assembled by SCI are marketed in ways that are directly competitive to computers assembled and marketed by Gateway.

### B.   Chronology of Events

Livak graduated from Syracuse University in 1982 and began working in the computer industry. By 1992, he had become the plant manager for SCI at its Huntsville, Alabama, facility. He left that position in May of 1995, and began working for Gateway. At that time, he signed a non-compete agreement prohibiting him

> *for a period of one year following the termination of Employee's employment with Gateway 2000, Inc.* [from] . . . (i) carry[ing] on any business which is directly or indirectly competitive with the business of Employer in any state of the United States or any country in which Employer conducts or solicits or has conducted or solicited business prior to the Termination Date; (ii) in any other manner compet[ing] with Employer or its successors and assigns in such business (whether directly or indirectly) as an individual, partner, shareholder, director, officer, principal, agent, consultant, employee, or in any other relationship or capacity.

He also agreed to not reveal "information of a confidential nature . . . unless and until such information enters the public domain other than through any action or inaction by Employee." The agreement provided that South Dakota law governs its interpretation.[2]

After having been with Gateway for only 2½ years, Livak decided to leave and asked Gateway's Human Resources Manager to draw up an employment separation agreement. On January 21, 1998, Gateway and Livak came to terms. He signed an agreement stating that "[t]he parties acknowledge and agree that it is in their mutual best interest to amicably terminate their 'at will' employment relationship." Gateway immediately vested Livak's rights in 5,150 shares of previously awarded Gateway stock options, which had a value of approximately $60,000. It also agreed to pay Livak's salary and benefits for a six month period, or until he located other full-time employment. In exchange, Livak reaffirmed the covenants in his May 1995 non-compete agreement, and agreed that he would not bring suit against Gateway for the termination of his employment. The separation agreement provided a formal written procedure by which Livak could ask Gateway to waive the non-compete provisions with respect to a specific company that he wanted to work for.

Livak then moved to Memphis, Tennessee, and started working for Inca as its liaison representative to SCI. He never asked Gateway to waive his non-compete agreement while he was employed by Inca. By early April, 1998, Inca closed its facility in Memphis and Livak relocated to Michigan. On April 20, Gateway filed suit against Livak in the Western District of Tennessee seeking to enjoin him from working for Inca. Four days later, that court denied Gateway's motion for a temporary restraining order without prejudice and transferred the matter to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404. Because I was the presiding judge in the *Kelley* case, I was assigned *Livak* under our local companion case rule.

---

**1.**  A motherboard is the main board which holds a computer's key electronics such as the microprocessor, the memory, and other peripheral devices like the keyboard, mouse and monitor.

**2.**  This agreement is essentially identical to the one Kelley signed except that Kelley's agreement called for the application of Iowa law. *Kelley,* 9 F.Supp.2d at 792–93.

*See* Local Rule 83.11. Counsel[3] was advised that a hearing on *Livak* was set for August 13, 1998. For a brief moment in late June, it appeared this suit would be rendered moot because Livak stated he was resigning from Inca effective August 7. However, when Gateway discovered he was leaving Inca to become an SCI employee, again without seeking a waiver of his non-compete covenants, Gateway viewed the move as an attempt to further delay its efforts to enforce the non-compete agreement. Thus, the hearing went forward on August 13. I then issued a temporary restraining order prohibiting Livak from working for SCI and held a further evidentiary hearing on August 20. I now rule on Gateway's motion for a preliminary injunction.

## II. Analysis

■ Before issuing a preliminary injunction, I am required to balance four factors: "(1) likelihood of success on the merits; (2) the irreparable harm that could result if the injunction is not issued; (3) the impact on the public interest; and (4) the possibility of substantial harm to others." *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992).

### A. Likelihood of Success on the Merits

■ A threshold issue to deciding whether Gateway has a likelihood of success on the merits turns on determining what law governs the interpretation of Livak's non-compete agreement. Because this case was originally filed in the Western District of Tennessee, Tennessee's conflict of law rules apply. *See Van Dusen v. Barrack,* 376 U.S. 612, 636, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). Under Tennessee conflict of law rules, the "contracting parties' choice of law provision is valid *absent* contravention of public policy of the forum state or a showing that the selected forum does not bear a reasonable relationship to the transaction." *Carefree Vacations, Inc. v. Brunner,* 615 F.Supp. 211, 215 (W.D.Tenn.1985). Both the non-compete

agreement and the separation agreement state that South Dakota law governs their interpretation. Since Gateway has been headquartered in South Dakota for the length of Livak's employment with it, Livak's direct supervisors were located in South Dakota, and the severance agreement purports to have been signed in South Dakota, I hold South Dakota has sufficient contacts with the present dispute to justify the application of its law. Thus, South Dakota law applies unless Livak can show that non-compete agreements violate Tennessee public policy.

Livak reads Tenn.Code Ann. § 47–25–101 to state that "contracts ... between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition ... are declared to be against public policy, unlawful, and void." Livak argues this shows Tennessee opposes non-compete-agreements. I am not persuaded that this is Tennessee's policy because the Tennessee Supreme Court has specifically stated that while "[non-compete] covenants are not favored in Tennessee because they are in restraint of trade ... [t]hey are not, however, invalid per se and may be enforced, provided, they are reasonable under the particular circumstances." *Hasty v. Rent–A–Driver, Inc.,* 671 S.W.2d 471, 472 (Tenn.1984). Tennessee only prohibits unreasonable non-compete agreements. Since South Dakota law provides a process for determining the reasonableness of non-compete agreements, I interpret the relevant contracts under the parties' contractually stipulated choice of South Dakota law.[4]

#### 1. South Dakota law

■ South Dakota Codified Law ("SDCL") 53–9–11 provides "[a]n employee may agree with an employer at the time of employment or at any time during his employment not to engage directly or indirectly in the same business or profession as that of his employer for any period not exceeding two years from the date of termination of the

---

3. The *Kelley* and *Livak* matters are being handled by the same attorneys on both sides.

4. I note that if Michigan's choice of law rules were to apply, South Dakota law would still

govern the interpretation of the non-compete agreement. *See Kelley,* 9 F.Supp.2d at 794–95 (applying Michigan law to uphold contractual stipulation that Iowa law governed).

agreement." S.D. Codified laws § 53–9–11 (Michie 1997). In *Central Monitoring Service Inc. v. Zakinski*, 553 N.W.2d 513 (S.D. 1996), the Supreme Court of South Dakota held that where "an employee voluntarily quits his employment or is fired for good cause ... no further showing of reasonableness will be necessary as long as the non-compete or non-disclosure agreement complies with SDCL 53–9–11. However, if an employee is fired for no fault of his own, the court needs to go further to determine whether the agreement is reasonable." *Id.* at 521. Since Livak's non-compete agreement conforms to the dictates of SDCL 53–9–11, no further inquiry into its reasonableness is necessary so long as I find Livak voluntarily left Gateway.

Surprisingly, Livak now asserts that he did not voluntarily leave Gateway. In support of this position, he avers that it was commonly known he was in grave danger of being fired. He also believes that the fact that his last day of work was January 15, 1998, while the severance agreement was not signed until January 21, supports a finding that he was forced out.

Livak's evidence is insufficient to dispel the plain import of the separation agreement. The court in *Central Monitoring* explained that employees who quit and those who are fired are treated differently because "[t]he employer who fires an employee for failing to perform in a manner that promotes the employer's business interests deems the employee worthless. Once such a determination is made by the employer, the need to protect itself from the former employee is diminished by the fact that the employee's worth to the corporation is presumably insignificant." *Id.* at 520. The generous severance compensation Gateway paid Livak, $60,000 in vested stock options plus six months paid salary and benefits, were given in exchange for an affirmation of Livak's non-compete agreement. This indicates that Gateway did not consider Livak to be "worthless" or "insignificant," but instead felt a heightened need of protection from Livak's competition. Livak is not entitled to the reasonableness inquiry which *Central Monitoring* gives to employees whose former bosses deem them to be

"worthless." The non-compete agreement is therefore valid under South Dakota law.

### 2. Gateway and SCI are competitive

■ Since the non-compete agreement is valid, I turn to the question whether SCI and Gateway are competitors. If they are not competitors, Livak arguably does not violate the agreement. From the evidence presented, I find that Gateway's business involves the solicitation of individualized orders for computers from customers. It assembles those computers according to its customers' precise needs in a cost and time efficient manner. SCI is a major multinational conglomerate which engages in the manufacture and servicing of diverse types of electronic and technological devices. One of its services is the assembly of a computer in accordance with a customer's precise specifications. This is the identical "made-to-order" work in which Gateway engages.

Livak offers two theories in opposition to a finding of competition. He first focuses upon the fact that SCI sells motherboards to Gateway. Livak argues that this proves that Gateway and SCI are not competing because Gateway would not do business with a competitor. Livak's argument overlooks the fact that SCI does its overall business in the "computer, computer peripheral, telecommunication, medical, industrial, consumer, and military and aerospace markets." SCI 1997 Annual Report, at 1. The relationship between these two companies is complex. They are competitors, suppliers, and customers, i.e., the purchase of motherboards by Gateway from SCI. But this does not minimize the fact that they are strong competitors in a highly competitive field.

Livak also argues that SCI is not in competition with Gateway because Gateway ships computers to its end-user while SCI does not. This distinction is not dispositive. The fact that SCI obtains computer assembly work through third party "outsourcing" contracts does not prevent a finding that it competes with Gateway. The critical determination turns on whether SCI assembles computers that are sold in competition with Gateway-assembled computers. Since this occurs, I find SCI competes with Gateway.

In summary, Livak signed a non-compete agreement and a separation agreement which restrict him from working for any direct or indirect competitor for one year after he leaves Gateway. Such an agreement is valid under South Dakota law. Livak is presently employed by SCI, a direct competitor of Gateway. Livak's violation of a valid non-compete agreement means Gateway has a strong likelihood of success on the merits of this lawsuit.

### B. Irreparable Harm

The United States Court of Appeals for the Sixth Circuit has stated that a finding of irreparable harm is appropriate when "losses are difficult to compute." *Basicomputer*, 973 F.2d at 511. The non-compete agreement Livak signed specifically states that "[t]he parties acknowledge and agree that the extent of damages to Gateway 2000, Inc. in the event of a breach by Employee would be impossible to ascertain and there is and will be available to Gateway 2000, Inc. no adequate remedy at law in the event of a breach." Similarly, Livak acknowledges in his separation agreement that he "had access to confidential information of Employer that was and is special and unique" including things such as "trade secrets, files, policies, computer and other data bases, not generally known by others engaged in a business similar to that conducted or contemplated by Employer." By accepting employment from a direct competitor just a few days after reaffirming his access to "special and unique" information, Livak creates a strong inference that he will be using this information in his new job. Since he has already acknowledged that using this information will cause damage to Gateway that will be impossible to ascertain, I find a strong probability of irreparable harm.[5]

### C. Harm to Others

When a court issues an injunction enforcing a non-compete agreement, there is harm to the enjoined employee. In this case, Li-

vak's separation agreement mitigates much of that harm. In addition to the $60,000 in vested stock options, Livak was entitled to collect his full salary and benefits for a period of six months. He was free to use this time to search for new employment. Upon identifying a potential new employer, the separation agreement provided a formal written process by which Livak could determine if Gateway would waive his non-compete agreement with respect to that employer. Livak ignored this process when he started working for both Inca and SCI. Thus, Livak wilfully incurred the risk that Gateway would seek enforcement of the non-compete agreement. Any harm he now suffers is therefore significantly mitigated because he could have easily have avoided this harm by simply following the procedures in his separation agreement.

### D. Public Interest

My comment in *Kelley* that "the public's ability to purchase a computer will [not] be influenced in the least by the outcome of this case," is equally applicable here. *Kelley*, 9 F.Supp.2d at 797–98. The public interest therefore neither favors nor opposes granting an injunction.

### E. Balancing the Factors

Gateway has shown a strong likelihood of success on the merits and a probability it will be irreparably harmed. The harm to Livak is lessened by his own conduct and the public interest is neither harmed nor helped by issuing an injunction. Examining these four *Basicomputer* factors, I find they weigh heavily in favor of granting Gateway the requested injunction.

### III. Conclusion

Gateway's motion for a preliminary injunction is GRANTED. Defendant Jeffrey Livak is hereby ENJOINED from working for any competitor of Gateway 2000, Inc., including without limitation Inca Computer Co. and

---

**5.** In the *Kelley* case, Gateway's action of creating less restrictive non-compete agreements led to the inference that Gateway did not need the full protection of the non-compete covenant Kelley signed. *Kelley*, 9 F.Supp.2d at 797–98. I cannot draw the same inference here. By paying Livak $60,000 worth of stock options to reaffirm his non-compete agreement, Gateway has shown a significant need for protection.

SCI Systems, until one year from the date of the termination of his employment with Gateway 2000, Inc. Jeffrey Livak is also ENJOINED from disclosing to anyone other than Gateway 2000, Inc. information of a confidential nature relating to Gateway 2000, Inc. or its subsidiaries including, without limitation, customer lists, supplier lists, methods of operation, work product, prices, tariffs, processes, methods, trade secrets, secret producers, names of or agreements with any suppliers, techniques or know-how, or improvements in any of the foregoing owned or used by Gateway 2000, Inc. except with the prior written consent of Gateway 2000, Inc. unless and until such information enters the public domain other than through any action or inaction by the defendant. Information for the purposes of this Order shall be considered to be confidential if not known by the trade generally, even though such information may have been disclosed to one or more third parties pursuant to specific agreements entered into by Gateway 2000, Inc. and such third party or parties.

This preliminary injunction is effective August 28, 1998, at 9:00 a.m.

IT IS SO ORDERED.